E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
J. JAMARI BUXTON (Cal. Bar No. 342364)
BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3519/3819
    Facsimile: (213) 894-0141
    E-mail:    jamari.buxton@usdoj.gov
               brian.faerstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 23-CR-133-PA-2 |
|---|---|
| Plaintiff, | PLEA AGREEMENT FOR DEFENDANT CHRISTOPHER BLAIR HERNANDEZ |
| v. | |
| CHRISTOPHER BLAIR HERNANDEZ, | |
| Defendant. | |

1.    This constitutes the plea agreement between CHRISTOPHER BLAIR HERNANDEZ ("defendant") and the United States Attorney's Office for the Central District of California ("the USAO") in the above-captioned case.  This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

DEFENDANT'S OBLIGATIONS

2.    Defendant agrees to:

    a.    At the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to Count One of the

indictment in <u>United States v. CHRISTOPHER BLAIR HERNANDEZ</u>, No. 23-CR-133-PA-2, which charges defendant with Conspiracy, in violation of 18 U.S.C. § 371.

b.   Not contest facts agreed to in this agreement.

c.   Abide by all agreements regarding sentencing contained in this agreement.

d.   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.   Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

g.   Pay the applicable special assessment at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

h.   Defendant agrees that any and all criminal debt ordered by the Court will be due in full and immediately.  The government is not precluded from pursuing, in excess of any payment schedule set by the Court, any and all available remedies by which to satisfy defendant's payment of the full financial obligation, including referral to the Treasury Offset Program.

i.   Complete the Financial Disclosure Statement on a form provided by the USAO and, within 30 days of defendant's entry of a guilty plea, deliver the signed and dated statement, along with all of the documents requested therein, to the USAO by either email at

usacac.FinLit@usdoj.gov (preferred) or mail to the USAO Financial Litigation Section at 300 North Los Angeles Street, Suite 7516, Los Angeles, CA 90012.  Defendant agrees that defendant's ability to pay criminal debt shall be assessed based on the completed Financial Disclosure Statement and all required supporting documents, as well as other relevant information relating to ability to pay.

j.    Authorize the USAO to obtain a credit report upon returning a signed copy of this plea agreement.

k.    Consent to the USAO inspecting and copying all of defendant's financial documents and financial information held by the United States Probation and Pretrial Services Office.

3.    Defendant further agrees to cooperate fully with the USAO, the Federal Bureau of Investigation, and, as directed by the USAO, any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authority.  This cooperation requires defendant to:

a.    Respond truthfully and completely to all questions that may be put to defendant, whether in interviews, before a grand jury, or at any trial or other court proceeding.

b.    Attend all meetings, grand jury sessions, trials or other proceedings at which defendant's presence is requested by the USAO or compelled by subpoena or court order.

c.    Produce voluntarily all documents, records, or other tangible evidence relating to matters about which the USAO, or its designee, inquires.

4.    For purposes of this agreement: (1) "Cooperation Information" shall mean any statements made, or documents, records, tangible evidence, or other information provided, by defendant

3

pursuant to defendant's cooperation under this agreement or pursuant to the letter agreement previously entered into by the parties dated June 22, 2023 (the "Letter Agreement"); and (2) "Plea Information" shall mean any statements made by defendant, under oath, at the guilty plea hearing and the agreed to factual basis statement in this agreement.

## THE USAO'S OBLIGATIONS

5.    The USAO agrees to:

a.    Not contest facts agreed to in this agreement.

b.    Abide by all agreements regarding sentencing contained in this agreement.

c.    At the time of sentencing, move to dismiss the remaining counts of the indictment as against defendant.  Defendant agrees, however, that at the time of sentencing the Court may consider any dismissed charges in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed.

d.    At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

6.    The USAO further agrees:

a.    Not to offer as evidence in its case-in-chief in the above-captioned case or any other criminal prosecution that may be brought against defendant by the USAO, or in connection with any sentencing proceeding in any criminal case that may be brought

against defendant by the USAO, any Cooperation Information. Defendant agrees, however, that the USAO may use both Cooperation Information and Plea Information: (1) to obtain and pursue leads to other evidence, which evidence may be used for any purpose, including any criminal prosecution of defendant; (2) to cross-examine defendant should defendant testify, or to rebut any evidence offered, or argument or representation made, by defendant, defendant's counsel, or a witness called by defendant in any trial, sentencing hearing, or other court proceeding; and (3) in any criminal prosecution of defendant for false statement, obstruction of justice, or perjury.

b.   Not to use Cooperation Information against defendant at sentencing for the purpose of determining the applicable guideline range, including the appropriateness of an upward departure, or the sentence to be imposed, and to recommend to the Court that Cooperation Information not be used in determining the applicable guideline range or the sentence to be imposed.  Defendant understands, however, that Cooperation Information will be disclosed to the United States Probation and Pretrial Services Office and the Court, and that the Court may use Cooperation Information for the purposes set forth in U.S.S.G § 1B1.8(b) and for determining the sentence to be imposed.

c.   In connection with defendant's sentencing, to bring to the Court's attention the nature and extent of defendant's cooperation.

d.   If the USAO determines, in its exclusive judgment, that defendant has both complied with defendant's obligations under paragraphs 2 and 3 above and provided substantial assistance to law enforcement in the prosecution or investigation of another

("substantial assistance"), to move the Court pursuant to U.S.S.G. § 5K1.1 to fix an offense level and corresponding guideline range below that otherwise dictated by the sentencing guidelines, and to recommend a term of imprisonment within this reduced range.

<u>DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION</u>

7.    Defendant understands the following:

a.    Any knowingly false or misleading statement by defendant will subject defendant to prosecution for false statement, obstruction of justice, and perjury and will constitute a breach by defendant of this agreement.

b.    Nothing in this agreement requires the USAO or any other prosecuting, enforcement, administrative, or regulatory authority to accept any cooperation or assistance that defendant may offer, or to use it in any particular way.

c.    Defendant cannot withdraw defendant's guilty plea if the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a reduced guideline range or if the USAO makes such a motion and the Court does not grant it or if the Court grants such a USAO motion but elects to sentence above the reduced range.

d.    At this time the USAO makes no agreement or representation as to whether any cooperation that defendant has provided or intends to provide constitutes or will constitute substantial assistance.  The decision whether defendant has provided substantial assistance will rest solely within the exclusive judgment of the USAO.

e.    The USAO's determination whether defendant has provided substantial assistance will not depend in any way on whether the government prevails at any trial or court hearing in which

1  defendant testifies or in which the government otherwise presents
2  information resulting from defendant's cooperation.

3                          NATURE OF THE OFFENSE

4       8.   Defendant understands that for defendant to be guilty of
5  the crime charged in Count One, that is, Conspiracy, in violation of
6  Title 18, United States Code, Section 371, the following must be
7  true: (1) beginning on or about April 13, 2020, and continuing
8  through at least on or about June 26, 2020, there was an agreement
9  between two or more persons to commit at least one crime as charged
10  in the indictment, namely: (i) Deprivation of Rights Under Color of
11  Law, in violation of Title 18, United States Code, Section 242;
12  (ii) Tampering with a Witness, in violation of Title 18, United
13  States Code, Section 1512(b)(3); and (iii) Falsification of Records
14  in Federal Investigations, in violation of Title 18, United States
15  Code, Section 1519; (2) defendant became a member of the conspiracy
16  knowing of at least one of its objects and intending to help
17  accomplish it; and (3) one of the members of the conspiracy performed
18  at least one overt act for the purpose of carrying out the
19  conspiracy.

20                       PENALTIES AND RESTITUTION

21       9.   Defendant understands that the statutory maximum sentence
22  that the Court can impose for a violation of Title 18, United States
23  Code, Section 371, is: 5 years' imprisonment; a 3-year period of
24  supervised release; a fine of $250,000 or twice the gross gain or
25  gross loss resulting from the offense, whichever is greatest; and a
26  mandatory special assessment of $100.

27       10.  Defendant understands that supervised release is a period
28  of time following imprisonment during which defendant will be subject

to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

11.  Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

12.  Defendant understands that, if defendant is not a United States citizen, the felony conviction in this case may subject defendant to: removal, also known as deportation, which may, under some circumstances, be mandatory; denial of citizenship; and denial of admission to the United States in the future.  The Court cannot, and defendant's attorney also may not be able to, advise defendant fully regarding the immigration consequences of the felony convictions in this case.  Defendant understands that unexpected

1  immigration consequences will not serve as grounds to withdraw

2  defendant's guilty plea.

3      13.  Defendant agrees to make full restitution to the victim of

4  the offense to which defendant is pleading guilty.  Defendant agrees

5  that, in return for the USAO's compliance with its obligations under

6  this agreement, the Court may order restitution to persons other than

7  the victim of the offense to which defendant is pleading guilty and

8  in amounts greater than those alleged in the count to which defendant

9  is pleading guilty.  In particular, defendant agrees that the Court

10  may order restitution to any victim of any of the following for any

11  losses suffered by that victim as a result: (a) any relevant conduct,

12  as defined in U.S.S.G. § 1B1.3, in connection with the offense to

13  which defendant is pleading guilty; and (b) any counts dismissed.

14  <center>FACTUAL BASIS</center>

15      14.  Defendant admits that defendant is, in fact, guilty of the

16  offense to which defendant is agreeing to plead guilty.  Defendant

17  and the USAO agree to the statement of facts provided in Attachment A

18  hereto and agree that this statement of facts is sufficient to

19  support a plea of guilty to the charge described in this agreement

20  and to establish the Sentencing Guidelines factors set forth in

21  paragraph 16 below but is not meant to be a complete recitation of

22  all facts relevant to the underlying criminal conduct or all facts

23  known to either party that relate to that conduct.

24  <center>SENTENCING FACTORS</center>

25      15.  Defendant understands that in determining defendant's

26  sentence the Court is required to calculate the applicable Sentencing

27  Guidelines range and to consider that range, possible departures

28  under the Sentencing Guidelines, and the other sentencing factors set

<center>9</center>

forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crime of conviction.

16.  Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level: | 12 | U.S.S.G. § 2X1.1(a), U.S.S.G. § 2H1.1(a)(2) |
| Defendant was a public official at the time of the offense; offense was committed under color of law: | +6 | U.S.S.G. § 2X1.1(a), U.S.S.G. § 2H1.1(b)(1) |
| Obstructing or impeding the administration of justice: | +2 | U.S.S.G. § 3C1.1 |

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.

17.  Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

18.  Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

19.  Defendant understands that by pleading guilty, defendant gives up the following rights:

a.   The right to persist in a plea of not guilty.

b.   The right to a speedy and public trial by jury.

c.   The right to be represented by counsel – and if necessary have the Court appoint counsel - at trial.   Defendant understands, however, that, defendant retains the right to be represented by counsel – and if necessary have the Court appoint counsel – at every other stage of the proceeding.

d.   The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e.   The right to confront and cross-examine witnesses against defendant.

f.   The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

g.   The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h.   Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

WAIVER OF APPEAL OF CONVICTION AND COLLATERAL ATTACK

20.   Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.   Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty is unconstitutional, and any and all claims that

11

the statement of facts provided herein is insufficient to support defendant's plea of guilty.

21.   Defendant also gives up any right to bring a post-conviction collateral attack on the conviction or sentence, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered evidence, or an explicitly retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statutes of conviction. Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty is unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

22.   This agreement does not affect in any way the right of the USAO to appeal the sentence imposed by the Court, subject to the limitation set forth in paragraph 24.

<u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE</u>

23.   Defendant agrees that, provided the Court imposes a term of imprisonment within or below the range corresponding to an offense level of 17 and the criminal history category calculated by the Court, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (e) the term of probation or supervised release imposed by the Court, provided it is within the statutory

12

maximum; and (f) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in Second Amended General Order 20-04 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

24. The USAO agrees that, provided (a) all portions of the sentence are at or below the statutory maximum specified above and (b) the Court imposes a term of imprisonment within or above the range corresponding to an offense level of 17 and the criminal history category calculated by the Court, the USAO gives up its right to appeal any portion of the sentence.

## RESULT OF WITHDRAWAL OF GUILTY PLEA

25. Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement, including in particular its obligations regarding the use of Cooperation Information; (b) in any investigation, criminal prosecution, or civil, administrative, or regulatory action, defendant agrees that any Cooperation Information and any evidence derived from any Cooperation Information shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, or any federal rule, that any Cooperation Information or any evidence derived from any Cooperation Information should be suppressed or is inadmissible; and (c) should the USAO choose to pursue any charge that was either dismissed or not filed as

a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

<div align="center">RESULT OF VACATUR, REVERSAL OR SET-ASIDE</div>

26.  Defendant agrees that if the count of conviction is vacated, reversed, or set aside, both the USAO and defendant will be released from all their obligations under this agreement.

<div align="center">EFFECTIVE DATE OF AGREEMENT</div>

27.  This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

<div align="center">BREACH OF AGREEMENT</div>

28.  Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  For example, if defendant knowingly, in an interview, before a grand jury, or at trial, falsely accuses another person of criminal conduct or falsely minimizes defendant's own role, or the role of another, in criminal conduct, defendant will have breached this agreement.  All of defendant's obligations are material, a single breach of this agreement is

<div align="center">14</div>

sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing.  If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then:

        a.   If defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea.

        b.   The USAO will be relieved of all its obligations under this agreement; in particular, the USAO: (i) will no longer be bound by any agreements concerning sentencing and will be free to seek any sentence up to the statutory maximum for the crime to which defendant has pleaded guilty; (ii) will no longer be bound by any agreements regarding criminal prosecution, and will be free to criminally prosecute defendant for any crime, including charges that the USAO would otherwise have been obligated to dismiss pursuant to this agreement; and (iii) will no longer be bound by any agreement regarding the use of Cooperation Information and will be free to use any Cooperation Information in any way in any investigation, criminal prosecution, or civil, administrative, or regulatory action.

        c.   The USAO will be free to criminally prosecute defendant for false statement, obstruction of justice, and perjury based on any knowingly false or misleading statement by defendant.

        d.   In any investigation, criminal prosecution, or civil, administrative, or regulatory action: (i) defendant will not assert, and hereby waives and gives up, any claim that any Cooperation Information was obtained in violation of the Fifth Amendment privilege against compelled self-incrimination; and (ii) defendant agrees that any Cooperation Information and any Plea Information, as

well as any evidence derived from any Cooperation Information or any
Plea Information, shall be admissible against defendant, and
defendant will not assert, and hereby waives and gives up, any claim
under the United States Constitution, any statute, Rule 410 of the
Federal Rules of Evidence, Rule 11(f) of the Federal Rules of
Criminal Procedure, or any other federal rule, that any Cooperation
Information, any Plea Information, or any evidence derived from any
Cooperation Information or any Plea Information should be suppressed
or is inadmissible.

29.  Following the Court's finding of a knowing breach of this
agreement by defendant, should the USAO choose to pursue any charge
that was either dismissed or not filed as a result of this agreement,
then:

a.  Defendant agrees that any applicable statute of
limitations is tolled between the date of defendant's signing of this
agreement and the filing commencing any such action.

b.  Defendant waives and gives up all defenses based on
the statute of limitations, any claim of pre-indictment delay, or any
speedy trial claim with respect to any such action, except to the
extent that such defenses existed as of the date of defendant's
signing this agreement.

## COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES
## OFFICE NOT PARTIES

30.  Defendant understands that the Court and the United States
Probation and Pretrial Services Office are not parties to this
agreement and need not accept any of the USAO's sentencing
recommendations or the parties' agreements to facts or sentencing
factors.

31.   Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 16 are consistent with the facts of this case.  While this paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

32.   Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

1
<div align="center">NO ADDITIONAL AGREEMENTS</div>

2      33.   Defendant understands that, except as set forth herein,

3 there are no promises, understandings, or agreements between the USAO

4 and defendant or defendant's attorney, and that no additional

5 promise, understanding, or agreement may be entered into unless in a

6 writing signed by all parties or on the record in court.

7 <div align="center">PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</div>

8      34.   The parties agree that this agreement will be considered

9 part of the record of defendant's guilty plea hearing as if the

10 entire agreement had been read into the record of the proceeding.

11 AGREED AND ACCEPTED

12 UNITED STATES ATTORNEY'S OFFICE
   FOR THE CENTRAL DISTRICT OF
13 CALIFORNIA

14 E. MARTIN ESTRADA
   United States Attorney
15

16                                        July 19, 2023
_____
17 J. JAMARI BUXTON                       Date
   BRIAN R. FAERSTEIN
18 Assistant United States Attorneys

19 _____       July 18th, 2023
   CHRISTOPHER BLAIR HERNANDEZ           Date
20 Defendant

21                                        July 19, 2023
_____
22 MICHAEL D. WILLIAMSON                  Date
   Attorney for Defendant
23 CHRISTOPHER BLAIR HERNANDEZ

24 //

25 //

26 //

27

28
<div align="center">18</div>

<u>CERTIFICATION OF DEFENDANT</u>

I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charge and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____     7-18-2023
CHRISTOPHER BLAIR HERNANDEZ        Date
Defendant

//

//

//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CERTIFICATION OF DEFENDANT'S ATTORNEY

I am CHRISTOPHER BLAIR HERNANDEZ's attorney.  I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of a guilty plea pursuant to this agreement.

_____          July 19, 2023
MICHAEL D. WILLIAMSON                     Date
Attorney for Defendant
CHRISTOPHER BLAIR HERNANDEZ

**ATTACHMENT A**

FACTUAL BASIS

**I.   Defendants HERNANDEZ and VEGA Falsely Imprisoned J.A.**

1.   At all times relevant to this Factual Basis, defendant CHRISTOPHER BLAIR HERNANDEZ ("defendant HERNANDEZ") was a sworn law enforcement officer and deputy employed by the Los Angeles County Sheriff's Department ("LASD").  Defendant HERNANDEZ was assigned to work at LASD's Compton Station in Compton, California.

2.   On the afternoon of April 13, 2020, defendant HERNANDEZ was assigned to a patrol shift and was working with his partner, defendant MIGUEL ANGEL VEGA ("defendant VEGA"), who also was a sworn law enforcement officer and deputy employed by the LASD.  Defendants HERNANDEZ and VEGA were patrolling the area near Wilson Park in Compton as part of their official duties for LASD.  Defendants HERNANDEZ and VEGA were in full uniform and were traveling in a marked LASD sports utility vehicle (the "SUV").  Defendant VEGA was driving the SUV during the patrol shift.

3.   Shortly after 2:30 p.m. that day, defendants HERNANDEZ and VEGA saw two young African-American males outside an enclosed skateboard park within Wilson Park (the "skatepark").  An approximately 10-to-12-foot wrought-iron fence surrounded the perimeter of the skatepark.  After seeing the males, one of whom defendant HERNANDEZ believed was on probation, defendant VEGA drove the SUV over a curb and parked the SUV on the grass near the skatepark.  Defendants HERNANDEZ and VEGA then got out of the SUV and made contact with the African-American males, during which they directed the males to lift up their shirts.

DEFT. INITIALS *CH*

1       4.      Approximately 10-15 people were inside the enclosed
2   skatepark during the encounter between defendants HERNANDEZ and VEGA
3   and the African-American males.  Among them was Victim J.A.  From
4   inside the skatepark, J.A. yelled at defendants HERNANDEZ and VEGA to
5   leave the African-American males alone.  J.A. did not threaten
6   defendants HERNANDEZ and VEGA or anyone else at the skatepark.
7   Defendant VEGA began yelling back at J.A., saying words to the effect
8   of, "shut the fuck up, bitch" and "do you want to catch a fade?,"
9   which defendant HERNANDEZ understood to mean that defendant VEGA was
10  challenging J.A. to a fight.  Following defendant VEGA's challenge to
11  a fight, J.A. and defendant VEGA continued exchanging words,
12  including profanities.

13      5.      While J.A. and defendant VEGA continued to exchange words,
14  defendants HERNANDEZ and VEGA got back into the SUV, drove a short
15  distance toward an opening in the skatepark fence, and then got out
16  of the SUV again.  J.A. was near the opening in the skatepark fence.
17  Defendant VEGA grabbed J.A., pulled J.A. through the opening in the
18  skatepark fence, and placed J.A. in the back of the SUV, confining
19  J.A inside, as defendant HERNANDEZ looked on.  The detention of J.A.,
20  from grabbing him at the opening in the fence to placing him in the
21  back of the SUV, lasted approximately 10 seconds.  At no point during
22  the encounter, or any other point that day, did defendant HERNANDEZ
23  believe that J.A. was under the influence of a stimulant.

24      6.      Neither defendant HENDANDEZ nor defendant VEGA handcuffed
25  J.A. before defendant VEGA placed J.A. in the back of the SUV.
26  Defendants HERNANDEZ and VEGA also did not secure J.A.'s seatbelt,
27  did not tell J.A. that J.A. was under arrest, and did not inform J.A.
28  of J.A.'s rights at any time.  Nor did defendants HERNANDEZ and VEGA

DEFT. INITIALS _CH_              2

1   conduct any field sobriety tests to determine whether J.A. was
2   potentially under the influence of a stimulant.

3       7.    As J.A. was being detained, J.A. or another person inside
4   the skatepark asked defendants HERNANDEZ and VEGA what J.A. had done
5   wrong.   Defendant HERNANDEZ stated that J.A. had challenged them to a
6   fight, and he stated that was a crime.   At the time, defendant
7   HERNANDEZ knew that statement was not truthful and that, in fact,
8   defendant VEGA had challenged J.A. to a fight.   Defendant HERNANDEZ
9   further knew that defendants HERNANDEZ and VEGA had no other lawful
10  basis to detain J.A., including that J.A. purportedly exhibited
11  symptoms consistent with a person under the influence of a stimulant.

12      8.    After detaining J.A. in the back of the SUV, defendants
13  VEGA and HERNANDEZ got back inside the SUV.   Once inside, defendant
14  VEGA continued taunting J.A.   Defendant VEGA then drove away from the
15  skatepark.   At no time did defendants HERNANDEZ and VEGA utilize
16  their LASD radios to alert any other LASD personnel that they had
17  detained J.A., to request backup or supervisors to respond to the
18  skatepark or any other location, or otherwise to inform any other
19  LASD personnel about what happened at the skatepark or where they
20  were taking J.A.

21      9.    During the events at the skatepark, the crowd of onlookers
22  remained inside the skatepark, separated from defendants HERNANDEZ
23  and VEGA and the SUV by the 10-to-12-foot wrought-iron fence.   The
24  onlookers did not pose any danger to defendants HERNANDEZ and VEGA.
25  None of the onlookers threatened defendants HERNANDEZ and VEGA.   None
26  of the onlookers advanced on defendants HERNANDEZ and VEGA or the
27  SUV.   And none of the onlookers followed the SUV as it drove away
28  from the skatepark.   Had defendants HERNANDEZ and VEGA wanted or

DEFT. INITIALS $C\cancel{H}$                    3

1  intended to do so, they had ample time and opportunity to safely
2  handcuff J.A., to secure J.A.'s seatbelt, and to conduct field
3  sobriety tests on J.A., either at the skatepark or at some other
4  nearby location.

5       10.  After leaving the Wilson Park area, defendant VEGA drove
6  the SUV north on Alameda Street.  As they drove, defendant VEGA again
7  challenged J.A. to a fight and said words to the effect of, "I'll
8  fuck you up."  J.A. initially talked back but then said that J.A. did
9  not want any problems.  For his part, defendant HERNANDEZ told J.A.
10 that he would kick J.A.'s ass if he and J.A. fought.

11      11.  Defendant VEGA further threatened J.A. by stating that
12 defendants VEGA and HERNANDEZ were going to "get [J.A.] set up," or
13 words to that effect, and made reference to a street gang that
14 claimed territory in the general area.  Defendant HERNANDEZ
15 understood defendant VEGA to be attempting to intimidate J.A. by
16 saying that they were going to find gang members to beat up J.A.
17 Defendant HERNANDEZ had no reason to believe J.A. was a gang member,
18 had never seen J.A. hanging out with gang members or engaging in any
19 gang-related activity, and in fact believed that J.A. was not a gang
20 member.

21      12.  At one point while they were driving, defendant VEGA asked
22 J.A. what medications J.A. had taken that day and said words to the
23 effect of, "you must be on something the way you're talking to me."
24 Defendant HERNANDEZ understood defendant VEGA to be suggesting that
25 defendants HERNANDEZ and VEGA were going to fabricate and falsely
26 allege, as a pretext to justify their false imprisonment of J.A.,
27 that J.A. exhibited symptoms of being under the influence of a
28 stimulant.  Even though defendant HERNANDEZ did not believe that J.A.

DEFT. INITIALS *CH*                4

1  was under the influence of a stimulant and knew that there was no

2  lawful basis for J.A.'s ongoing detention, defendant HERNANDEZ did

3  not take any steps to release J.A., challenge defendant VEGA's

4  actions, or alert a supervisor about what had occurred and was

5  occurring.  Instead, defendant HERNANDEZ chose to proceed with the

6  plan defendant VEGA suggested, through his initial comments about the

7  medications J.A. must be taking, to falsely allege that J.A. appeared

8  to be under the influence of a stimulant.

9  **II.  Defendants HERNANDEZ and VEGA Concealed Information About J.A.**
   **From Their Supervisor**

10

11         13.    While continuing to drive with J.A. confined in the back of

12  the SUV, defendants HERNANDEZ and VEGA saw a group of young males on

13  bicycles near the intersection of Alameda Street and 129th Street in

14  Compton.  One of the males appeared to grab his waistband and then

15  rode away on his bicycle, turning down an alleyway.  Defendant VEGA

16  began pursuing the bicyclist in the SUV.  At the mouth of the alley,

17  defendant HERNANDEZ got out of the SUV, ran a short distance, and

18  took a containment position.  Defendant VEGA continued following the

19  bicyclist through the alley with J.A. still confined in the back of

20  the SUV without a seatbelt.  Moments later, defendant HERNANDEZ heard

21  the SUV loudly crashing in the alley.

22         14.    Soon after, defendant VEGA reported over LASD radio that he

23  was pursuing a suspect with a gun who was fleeing.  Several minutes

24  later, defendant VEGA reported over LASD radio that he had been

25  involved in a traffic collision and the suspect had purportedly

26  tossed an article in the alley.  However, defendant VEGA did not

27  disclose that a person that defendants VEGA and HERNANDEZ had

28  detained (*i.e.*, J.A.) had been in the SUV at the time of the

DEFT. INITIALS _CH_                    5

1    collision.   J.A. hit his face and head during the collision and was
2    later treated at the hospital for a cut above his right eye, which
3    required stiches.   Numerous deputies began responding to the area to
4    search for the suspect and the article the suspect purportedly
5    discarded.   Defendant HERNANDEZ eventually left his containment
6    position and went to look for defendant VEGA, whom he found in the
7    alley near the wrecked SUV.

8         15.   Upon seeing defendant VEGA, defendant HERNANDEZ asked where
9    J.A. was.   Defendant VEGA replied that he had "kicked" J.A., which
10   defendant HERNANDEZ understood to mean that defendant VEGA had let
11   J.A. go after the traffic collision.   Defendant HERNANDEZ responded
12   something to the effect of that defendant VEGA was an "idiot" for
13   letting J.A. go.   Unbeknownst to defendant VEGA, another LASD deputy
14   who responded to the area encountered J.A. while searching for the
15   suspect and re-detained J.A. believing, incorrectly, that J.A. was
16   the person who defendant VEGA had been pursuing in the alley.

17        16.   After meeting with defendant VEGA, defendant HERNANDEZ
18   searched the area for the article that defendant VEGA claimed the
19   suspect had supposedly tossed.   At one point, Sergeant-1, who was
20   defendants HERNANDEZ and VEGA's supervisor, and who had responded to
21   the alley near the site of the traffic collision, spoke with
22   defendants HERNANDEZ and VEGA.   Defendants HERNANDEZ and VEGA told
23   Sergeant-1 that they were okay and that defendant HERNANDEZ had not
24   been in the SUV at the time of the collision.   However, neither
25   defendant HERNANDEZ nor defendant VEGA disclosed to Sergeant-1 that
26   they had detained J.A. in the back of the SUV following the encounter
27   at the skatepark or that J.A. had been in the SUV during the
28   collision.   Defendant HERNANDEZ knew that it was wrong to conceal

DEFT. INITIALS _CH_                    6

1  this information from Sergeant-1 and that this information would be
2  important to Sergeant-1.  Defendant HERNANDEZ feared that disclosing
3  the information would get defendants HERNANDEZ and VEGA into trouble
4  because they had no lawful basis to detain J.A. and because they had
5  violated LASD policy by not handcuffing J.A. or securing J.A.'s
6  seatbelt in the SUV.

7      17.  At some point on or about the afternoon of April 13, 2020,
8  defendants HERNANDEZ and VEGA each learned that another LASD deputy
9  had independently re-detained J.A.

10 **III. Defendants HERNANDEZ and VEGA Directed Another Deputy to Cite
11     J.A. For Being Under the Influence of Methamphetamine and
       Falsified Two Incident Reports to Cover Up Their Unlawful
       Conduct**

12     18.  Despite an extensive search, LASD deputies were unable to
13 find either the suspect defendant VEGA had reported pursuing or the
14 article the suspect supposedly tossed while fleeing.

15     19.  At some point later that day, after defendant VEGA
16 initially concealed the information during his LASD radio report of
17 the traffic collision and his initial meeting with Sergeant-1,
18 defendant VEGA finally disclosed to other deputies and Sergeant-1
19 that J.A. had been in the back of the SUV.

20     20.  At one point on or about the early evening of April 13,
21 2020, defendant HERNANDEZ spoke by phone with another LASD deputy who
22 had escorted J.A. to the hospital so that J.A. could receive
23 treatment for the cut J.A. sustained above J.A.'s eye during the
24 traffic collision.  Consistent with the plan articulated by defendant
25 VEGA to cover up their unlawful detention of J.A. following the
26 encounter at the skatepark, defendant HERNANDEZ directed the LASD
27 deputy at the hospital to issue J.A. a citation for being under the

DEFT. INITIALS *CH*                    7

1   influence of methamphetamine, even though defendants HERNANDEZ and

2   VEGA knew this to be false.  The LASD deputy followed defendant

3   HERNANDEZ's direction and issued the citation.  The LASD deputy also

4   asked J.A. to provide a urine sample at defendant HERNANDEZ's

5   direction, which J.A. declined.

6        21.  Defendants HERNANDEZ and VEGA eventually returned to

7   Compton Station and went to the report writing room to prepare two

8   separate incident reports regarding the day's events.  One report,

9   identified as LASD Incident Report No. 920-04690-2822-399, described

10  the alleged circumstances surrounding defendants HERNANDEZ and VEGA's

11  detention of J.A. at the skatepark (the "detention report").  The

12  other report, identified as LASD Incident Report No. 920-04687-2820-

13  151, described the alleged circumstances surrounding defendant VEGA's

14  pursuit of the young male on a bicycle and the resulting traffic

15  collision (the "collision report").

16       22.  Defendants HERNANDEZ and VEGA sat at different computer

17  terminals and each took turns working on the detention report and the

18  collision report.  Defendants HERNANDEZ and VEGA wrote the reports

19  together and each coordinated in drafting the reports by adding,

20  deleting, and changing information.  When the detention and collision

21  reports were complete, defendants HERNANDEZ and VEGA reviewed the

22  reports and submitted them to a supervisor for review.  After

23  receiving comments from one or more supervisors, defendants HERNANDEZ

24  and VEGA later revised and re-submitted the reports, which later

25  became final.

26       23.  Because defendants HERNANDEZ and VEGA had detained J.A.

27  without any lawful basis, and because defendant VEGA had simply

28  released J.A., a detained suspect, following the collision in the

DEFT. INITIALS _CH_                    8

1   alley, in violation of LASD policy, only for J.A. to be independently

2   re-detained by another deputy and placed in another LASD vehicle,

3   defendants HERNANDEZ and VEGA intentionally included false,

4   misleading, and ambiguous information in the detention and collision

5   reports designed to falsely justify and legitimize, and ultimately

6   cover up, their unlawful conduct.

7       24.   Specifically, in the detention report, defendants HERNANDEZ

8   and VEGA falsely claimed that they detained J.A. because J.A.

9   exhibited symptoms of a person under the influence of a stimulant,

10  including, purportedly, profuse sweating, rapid speech, muttering

11  unknown words, erratic behavior, teeth grinding, heavy breathing, and

12  dilated pupils.  In fact, as defendants HERNANDEZ and VEGA knew, J.A.

13  did not exhibit such symptoms.  Defendants HERNANDEZ and VEGA further

14  falsely claimed in the detention report that J.A. threatened to harm

15  people in the skatepark; that J.A. also threatened to harm defendants

16  HERNANDEZ and VEGA; and that the crowd of people in the skatepark

17  continued to move toward the SUV as defendants HERNANDEZ and VEGA

18  drove away from the skatepark, the latter of which purportedly

19  explained why defendants HERNANDEZ and VEGA chose, for purported

20  safety reasons, not to handcuff, secure, or administer field sobriety

21  tests to J.A.  Defendants HERNANDEZ and VEGA knew that none of these

22  "facts" occurred.

23      25.   The detention report authored by defendants HERNANDEZ and

24  VEGA also referenced the subsequent traffic collision and falsely

25  claimed that after the crash, defendant VEGA requested an assisting

26  unit to respond, checked J.A. for injuries, and that J.A. was placed

27  in the patrol vehicle of an assisting unit and detained until

28  paramedics arrived, when, in fact, as defendants HERNANDEZ and VEGA

DEFT. INITIALS _CH_                9

1  knew, defendant VEGA had instead simply released J.A. from the SUV
2  without checking J.A. for injuries or placing him in a patrol vehicle
3  until paramedics arrived.  Likewise, in the collision report,
4  defendants HERNANDEZ and VEGA again falsely claimed that while
5  assisting units were setting up a containment area following the
6  traffic collision, defendant VEGA transferred J.A. to another patrol
7  vehicle, when, in fact, as defendants HERNANDEZ and VEGA knew,
8  defendant VEGA never transferred J.A. to another patrol vehicle.
9       26.    Defendant HERNANDEZ knew when he and defendant VEGA wrote
10 and endorsed all of these statements that the statements were
11 deliberately false and he made them intending to conceal and cover up
12 their unlawful conduct from April 13, 2020.

DEFT. INITIALS                    10