E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
J. JAMARI BUXTON (Cal. Bar No. 342364)
BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3519/3819
    Facsimile: (213) 894-0141
    E-mail:    jamari.buxton@usdoj.gov
               brian.faerstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 23-CR-133-PA-1 |
|---|---|
| Plaintiff, | PLEA AGREEMENT FOR DEFENDANT MIGUEL ANGEL VEGA |
| v. | |
| MIGUEL ANGEL VEGA, | |
| Defendant. | |

1.    This constitutes the plea agreement between MIGUEL ANGEL
VEGA ("defendant") and the United States Attorney's Office for the
Central District of California (the "USAO") in the above-captioned
case.  This agreement is limited to the USAO and cannot bind any
other federal, state, local, or foreign prosecuting, enforcement,
administrative, or regulatory authorities.

DEFENDANT'S OBLIGATIONS

2.    Defendant agrees to:

      a.    At the earliest opportunity requested by the USAO and
provided by the Court, appear and plead guilty to Count Two of the

indictment in <u>United States v. MIGUEL ANGEL VEGA</u>, No. 23-CR-133-PA-1, which charges defendant with Deprivation of Rights Under Color of Law, in violation of 18 U.S.C. § 242.

  b. Not contest facts agreed to in this agreement.

  c. Abide by all agreements regarding sentencing contained in this agreement.

  d. Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

  e. Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

  f. Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

  g. Pay the applicable special assessment at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessment.

  h. Defendant agrees that any and all criminal debt ordered by the Court will be due in full and immediately.  The government is not precluded from pursuing, in excess of any payment schedule set by the Court, any and all available remedies by which to satisfy defendant's payment of the full financial obligation, including referral to the Treasury Offset Program.

  i. Complete the Financial Disclosure Statement on a form provided by the USAO and, within 30 days of defendant's entry of a guilty plea, deliver the signed and dated statement, along with all of the documents requested therein, to the USAO by either email at

2

1  usacac.FinLit@usdoj.gov (preferred) or mail to the USAO Financial

2  Litigation Section at 300 North Los Angeles Street, Suite 7516, Los

3  Angeles, CA 90012.  Defendant agrees that defendant's ability to pay

4  criminal debt shall be assessed based on the completed Financial

5  Disclosure Statement and all required supporting documents, as well

6  as other relevant information relating to ability to pay.

7          j.   Authorize the USAO to obtain a credit report upon

8  returning a signed copy of this plea agreement.

9          k.   Consent to the USAO inspecting and copying all of

10 defendant's financial documents and financial information held by the

11 United States Probation and Pretrial Services Office.

<u>THE USAO'S OBLIGATIONS</u>

13     3.   The USAO agrees to:

14          a.   Not contest facts agreed to in this agreement.

15          b.   Abide by all agreements regarding sentencing contained

16 in this agreement.

17          c.   At the time of sentencing, move to dismiss the

18 remaining counts of the indictment as against defendant.  Defendant

19 agrees, however, that at the time of sentencing the Court may

20 consider any dismissed charges in determining the applicable

21 Sentencing Guidelines range, the propriety and extent of any

22 departure from that range, and the sentence to be imposed.

23          d.   At the time of sentencing, provided that defendant

24 demonstrates an acceptance of responsibility for the offense up to

25 and including the time of sentencing, recommend a two-level reduction

26 in the applicable Sentencing Guidelines offense level, pursuant to

27 U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an

28 additional one-level reduction if available under that section.

1          e.    Recommend that defendant be sentenced to a term of

2     imprisonment no higher than the low end of the applicable Sentencing

3     Guidelines range, provided that the offense level used by the Court

4     to determine that range is 17 or higher and provided that the Court

5     does not depart downward in offense level or criminal history

6     category.  For purposes of this agreement, the low end of the

7     Sentencing Guidelines range is that defined by the Sentencing Table

8     in U.S.S.G. Chapter 5, Part A.

9                          NATURE OF THE OFFENSE

10         4.    Defendant understands that for defendant to be guilty of

11    the crime charged in Count Two, that is, Deprivation of Rights Under

12    Color of Law, in violation of Title 18, United States Code, Section

13    242, the following must be true: (1) defendant deprived the person

14    named in the indictment of a right secured by the Constitution or

15    laws of the United States, here, the Fourth Amendment right to be

16    free from unreasonable seizures; (2) defendant acted willfully,

17    specifically intending to deprive the individual of that right;

18    (3) defendant acted under color of law; (4) the person named in the

19    indictment was in the State of California at the time of the offense;

20    and (5) bodily injury resulted from defendant's conduct.

21                        PENALTIES AND RESTITUTION

22         5.    Defendant understands that the statutory maximum sentence

23    that the Court can impose for a felony violation of Title 18, United

24    States Code, Section 242, is: 10 years' imprisonment; a 3-year period

25    of supervised release; a fine of $250,000 or twice the gross gain or

26    gross loss resulting from the offense, whichever is greatest; and a

27    mandatory special assessment of $100.

28

                                    4

6.   Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

7.   Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

8.   Defendant understands that, if defendant is not a United States citizen, the felony conviction in this case may subject defendant to: removal, also known as deportation, which may, under some circumstances, be mandatory; denial of citizenship; and denial of admission to the United States in the future.  The Court cannot, and defendant's attorney also may not be able to, advise defendant

1 fully regarding the immigration consequences of the felony conviction
2 in this case.  Defendant understands that unexpected immigration
3 consequences will not serve as grounds to withdraw defendant's guilty
4 plea.

5     9.   Defendant agrees to make full restitution to the victim of
6 the offense to which defendant is pleading guilty.  Defendant agrees
7 that, in return for the USAO's compliance with its obligations under
8 this agreement, the Court may order restitution to persons other than
9 the victim of the offense to which defendant is pleading guilty and
10 in amounts greater than those alleged in the count to which defendant
11 is pleading guilty.  In particular, defendant agrees that the Court
12 may order restitution to any victim of any of the following for any
13 losses suffered by that victim as a result: (a) any relevant conduct,
14 as defined in U.S.S.G. § 1B1.3, in connection with the offense to
15 which defendant is pleading guilty; and (b) any counts dismissed.

16 FACTUAL BASIS

17     10.  Defendant admits that defendant is, in fact, guilty of the
18 offense to which defendant is agreeing to plead guilty.  Defendant
19 and the USAO agree to the statement of facts provided in Attachment A
20 hereto and agree that this statement of facts is sufficient to
21 support a plea of guilty to the charge described in this agreement
22 and to establish the Sentencing Guidelines factors set forth in
23 paragraph 12 below but is not meant to be a complete recitation of
24 all facts relevant to the underlying criminal conduct or all facts
25 known to either party that relate to that conduct.

26 SENTENCING FACTORS

27     11.  Defendant understands that in determining defendant's
28 sentence the Court is required to calculate the applicable Sentencing

6

Guidelines range and to consider that range, possible departures

under the Sentencing Guidelines, and the other sentencing factors set

forth in 18 U.S.C. § 3553(a).  Defendant understands that the

Sentencing Guidelines are advisory only, that defendant cannot have

any expectation of receiving a sentence within the calculated

Sentencing Guidelines range, and that after considering the

Sentencing Guidelines and the other § 3553(a) factors, the Court will

be free to exercise its discretion to impose any sentence it finds

appropriate up to the maximum set by statute for the crime of

conviction.

12.  Defendant and the USAO agree to the following applicable

Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level: | 12 | U.S.S.G. § 2H1.1(a)(2) |
| Defendant was a public official at the time of the offense; offense was committed under color of law: | +6 | U.S.S.G. § 2H1.1(b)(1) |
| Obstructing or impeding the administration of justice: | +2 | U.S.S.G. § 3C1.1 |

Defendant and the USAO reserve the right to argue that additional

specific offense characteristics, adjustments, and departures under

the Sentencing Guidelines are appropriate.

13.  Defendant understands that there is no agreement as to

defendant's criminal history or criminal history category.

14.  Defendant and the USAO reserve the right to argue for a

sentence outside the sentencing range established by the Sentencing

Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1),

(a)(2), (a)(3), (a)(6), and (a)(7).

1

## WAIVER OF CONSTITUTIONAL RIGHTS

2      15.  Defendant understands that by pleading guilty, defendant

3  gives up the following rights:

4              a.   The right to persist in a plea of not guilty.

5              b.   The right to a speedy and public trial by jury.

6              c.   The right to be represented by counsel -- and if

7  necessary have the Court appoint counsel -- at trial.  Defendant

8  understands, however, that, defendant retains the right to be

9  represented by counsel -- and if necessary have the Court appoint

10 counsel -- at every other stage of the proceeding.

11             d.   The right to be presumed innocent and to have the

12 burden of proof placed on the government to prove defendant guilty

13 beyond a reasonable doubt.

14             e.   The right to confront and cross-examine witnesses

15 against defendant.

16             f.   The right to testify and to present evidence in

17 opposition to the charges, including the right to compel the

18 attendance of witnesses to testify.

19             g.   The right not to be compelled to testify, and, if

20 defendant chose not to testify or present evidence, to have that

21 choice not be used against defendant.

22             h.   Any and all rights to pursue any affirmative defenses,

23 Fourth Amendment or Fifth Amendment claims, and other pretrial

24 motions that have been filed or could be filed.

25         WAIVER OF APPEAL OF CONVICTION AND COLLATERAL ATTACK

26     16.  Defendant understands that, with the exception of an appeal

27 based on a claim that defendant's guilty plea was involuntary, by

28 pleading guilty defendant is waiving and giving up any right to

appeal defendant's conviction on the offense to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty is unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

17.  Defendant also gives up any right to bring a post-conviction collateral attack on the conviction or sentence, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered evidence, or an explicitly retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statute of conviction.  Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty is unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

18.  This agreement does not affect in any way the right of the USAO to appeal the sentence imposed by the Court, subject to the limitation set forth in paragraph 20.

<u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE</u>

19.  Defendant agrees that, provided the Court imposes a total term of imprisonment on all counts of conviction within or below the range corresponding to an offense level of 17 and the criminal history category calculated by the Court, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the

1    fine imposed by the Court, provided it is within the statutory

2    maximum; (d) to the extent permitted by law, the constitutionality or

3    legality of defendant's sentence, provided it is within the statutory

4    maximum; (e) the term of probation or supervised release imposed by

5    the Court, provided it is within the statutory maximum; and (f) any

6    of the following conditions of probation or supervised release

7    imposed by the Court: the conditions set forth in Second Amended

8    General Order 20-04 of this Court; the drug testing conditions

9    mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and

10   drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

11        20.  The USAO agrees that, provided (a) all portions of the

12   sentence are at or below the statutory maximum specified above and

13   (b) the Court imposes a term of imprisonment within or above the

14   range corresponding to an offense level of 17 and the criminal

15   history category calculated by the Court, the USAO gives up its right

16   to appeal any portion of the sentence.

17                  RESULT OF WITHDRAWAL OF GUILTY PLEA

18        21.  Defendant agrees that if, after entering a guilty plea

19   pursuant to this agreement, defendant seeks to withdraw and succeeds

20   in withdrawing defendant's guilty plea on any basis other than a

21   claim and finding that entry into this plea agreement was

22   involuntary, then (a) the USAO will be relieved of all of its

23   obligations under this agreement; and (b) should the USAO choose to

24   pursue any charge that was either dismissed or not filed as a result

25   of this agreement, then (i) any applicable statute of limitations

26   will be tolled between the date of defendant's signing of this

27   agreement and the filing commencing any such action; and

28   (ii) defendant waives and gives up all defenses based on the statute

of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

<u>RESULT OF VACATUR, REVERSAL OR SET-ASIDE</u>

22.   Defendant agrees that if the count of conviction is vacated, reversed, or set aside, both the USAO and defendant will be released from all their obligations under this agreement.

<u>EFFECTIVE DATE OF AGREEMENT</u>

23.   This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

<u>BREACH OF AGREEMENT</u>

24.   Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing. If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea, and (b) the USAO will be relieved of all its obligations under this agreement.

25.   Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a.   Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.   Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c.   Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

## COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES OFFICE NOT PARTIES

26.   Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing

1    recommendations or the parties' agreements to facts or sentencing
2    factors.

3        27.  Defendant understands that both defendant and the USAO are
4    free to: (a) supplement the facts by supplying relevant information
5    to the United States Probation and Pretrial Services Office and the
6    Court, (b) correct any and all factual misstatements relating to the
7    Court's Sentencing Guidelines calculations and determination of
8    sentence, and (c) argue on appeal and collateral review that the
9    Court's Sentencing Guidelines calculations and the sentence it
10   chooses to impose are not error, although each party agrees to
11   maintain its view that the calculations in paragraph 12 are
12   consistent with the facts of this case.  While this paragraph permits
13   both the USAO and defendant to submit full and complete factual
14   information to the United States Probation and Pretrial Services
15   Office and the Court, even if that factual information may be viewed
16   as inconsistent with the facts agreed to in this agreement, this
17   paragraph does not affect defendant's and the USAO's obligations not
18   to contest the facts agreed to in this agreement.

19       28.  Defendant understands that even if the Court ignores any
20   sentencing recommendation, finds facts or reaches conclusions
21   different from those agreed to, and/or imposes any sentence up to the
22   maximum established by statute, defendant cannot, for that reason,
23   withdraw defendant's guilty plea, and defendant will remain bound to
24   fulfill all defendant's obligations under this agreement.  Defendant
25   understands that no one -- not the prosecutor, defendant's attorney,
26   or the Court -- can make a binding prediction or promise regarding
27   the sentence defendant will receive, except that it will be within
28   the statutory maximum.

NO ADDITIONAL AGREEMENTS

29.  Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

30.  The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

E. MARTIN ESTRADA
United States Attorney


_____          9/5/2023
J. JAMARI BUXTON                          _____
BRIAN R. FAERSTEIN                        Date
Assistant United States Attorneys


_____          8-31-2023
MIGUEL ANGEL VEGA                         _____
Defendant                                 Date


_____          8/31/23
BRIAN GURWITZ                             _____
Attorney for Defendant MIGUEL ANGEL       Date
VEGA

//

//

//

14

CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charge and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____          8-31-2023
MIGUEL ANGEL VEGA                         Date
Defendant

//

//

//

## CERTIFICATION OF DEFENDANT'S ATTORNEY

I am MIGUEL ANGEL VEGA's attorney.  I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of a guilty plea pursuant to this agreement.

_____          4/31/23
BRIAN GURWITZ                                    Date
Attorney for Defendant MIGUEL ANGEL
VEGA

16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTACHMENT A**

FACTUAL BASIS

**I.   Defendants VEGA and HERNANDEZ Falsely Imprisoned J.A.**

1.    At all times relevant to this Factual Basis, defendant MIGUEL ANGEL VEGA ("defendant VEGA") was a sworn law enforcement officer and deputy employed by the Los Angeles County Sheriff's Department ("LASD").  Defendant VEGA was assigned to work at LASD's Compton Station in Compton, California.

2.    On the afternoon of April 13, 2020, defendant VEGA was assigned to a patrol shift and was working with his partner, defendant CHRISTOPHER BLAIR HERNANDEZ ("defendant HERNANDEZ"), who also was a sworn law enforcement officer and deputy employed by the LASD.  Defendants VEGA and HERNANDEZ were patrolling the area near Wilson Park in Compton as part of their official duties for LASD. Defendants VEGA and HERNANDEZ were in full uniform and were traveling in a marked LASD sports utility vehicle (the "SUV").  Defendant VEGA was driving the SUV during the patrol shift.

3.    Shortly after 2:30 p.m. that day, defendants VEGA and HERNANDEZ saw two young African-American males outside an enclosed skateboard park within Wilson Park (the "skatepark").  An approximately 10-to-12-foot wrought-iron fence surrounded the perimeter of the skatepark.  After seeing the males, one of whom defendant VEGA believed was associated with a street gang, defendant VEGA drove the SUV over a curb and parked the SUV on the grass near the skatepark.  Defendants VEGA and HERNANDEZ then got out of the SUV and made contact with the African-American males, during which they directed the males to lift up their shirts to search for possible firearms, which the males did not possess.

DEFT. INITIALS MW/

4.    Approximately 10-15 people were inside the enclosed skatepark during the encounter between defendants VEGA and HERNANDEZ and the African-American males.  Among them was Victim J.A.  From inside the skatepark, J.A. yelled at defendants VEGA and HERNANDEZ to leave the African-American males alone.  Defendant VEGA began yelling back at J.A., saying words to the effect of, "shut the fuck up," and challenged J.A. to a fight.  Following defendant VEGA's challenge to a fight, J.A. and defendant VEGA continued exchanging words, including profanities.  J.A. did not threaten defendants VEGA and HERNANDEZ or anyone else at the skatepark at any time.

5.    While J.A. and defendant VEGA continued to exchange words, defendants VEGA and HERNANDEZ got back into the SUV, drove a short distance toward an opening in the skatepark fence, and then got out of the SUV again.  Defendant VEGA directed J.A. to come to the opening in the fence, grabbed J.A., and placed J.A. in the back of the SUV, confining J.A inside, as defendant HERNANDEZ looked on. Defendant VEGA detained J.A. in the SUV because he was angry that J.A. had told defendants VEGA and HERNANDEZ to leave the young African-American males alone and wanted to teach J.A. a lesson. Defendant VEGA understood in that moment and at all other times that day that he and defendant HERNANDEZ did not have any lawful basis to detain or arrest J.A.  At no point during the encounter, or any other point that day, did defendant VEGA believe that J.A. was under the influence of a stimulant.

6.    Neither defendant VEGA nor defendant HERNANDEZ handcuffed J.A. before defendant VEGA placed J.A. in the back of the SUV. Defendants VEGA and HERNANDEZ also did not secure J.A.'s seatbelt, did not tell J.A. that J.A. was under arrest, and did not inform J.A.

DEFT. INITIALS _M_                        2

of J.A.'s rights at any time.  Nor did defendants VEGA and HERNANDEZ
conduct any field sobriety tests to determine whether J.A. was
potentially under the influence of a stimulant.

7.   After detaining J.A. in the back of the SUV, defendants
VEGA and HERNANDEZ got back inside the SUV.  Defendant VEGA noticed
that some of the people within the skatepark were recording the
encounter with J.A. on their cellular phones.  Defendant VEGA drove
away from the skatepark in part because he did not want the encounter
to be captured on video.  At no time did defendants VEGA and
HERNANDEZ utilize their LASD radios to alert any other LASD personnel
that they had detained J.A., to request backup or supervisors to
respond to the skatepark or any other location, or otherwise to
inform any other LASD personnel about what happened at the skatepark
or where they were taking J.A.

8.   During the events at the skatepark, the crowd of onlookers
remained inside the skatepark, separated from defendants VEGA and
HERNANDEZ and the SUV by the 10-to-12-foot wrought-iron fence.  The
onlookers did not pose any danger to defendants VEGA and HERNANDEZ.
None of the onlookers threatened defendants VEGA and HERNANDEZ.  None
of the onlookers advanced on defendants VEGA and HERNANDEZ or the
SUV.  And none of the onlookers followed the SUV as it drove away
from the skatepark.  Had defendants VEGA and HERNANDEZ wanted or
intended to do so, they had ample time and opportunity to safely
handcuff J.A., to secure J.A.'s seatbelt, and to conduct field
sobriety tests on J.A., either at the skatepark or at a nearby
location.

9.   After leaving the Wilson Park area, defendant VEGA drove
the SUV north on Alameda Street.  As they drove, defendant VEGA

continued to taunt and threaten J.A. Among other things, defendant
VEGA stated that defendants VEGA and HERNANDEZ were going to drop off
J.A. in the territory of a street gang that was prominent in the
general area. Defendant VEGA made this threat to intimidate J.A. by
implying that they were going to find gang members to beat up J.A.
Defendant VEGA had never seen J.A. or heard J.A.'s name prior to the
encounter that day at the skatepark, and even though defendant VEGA
believed that people associated with a street gang frequented the
skatepark, defendant VEGA had no knowledge or reason to believe that
J.A. was a gang member.

10. While confined in the back of the SUV, J.A. asked
defendants VEGA and HERNANDEZ multiple times why he was being
detained, but defendants VEGA and HERNANDEZ ignored J.A.'s questions.
Defendant VEGA decided to concoct a story that he and defendant
HERNANDEZ were arresting J.A. for being under the influence of a
stimulant as a pretext to justify defendants VEGA and HERNANDEZ's
unlawful false imprisonment of J.A. From defendant VEGA's experience
as an LASD deputy, he believed that he and defendant HERNANDEZ could
book J.A. for that offense without being questioned by other LASD or
jail personnel given the subjective nature of the offense. As part
of defendant VEGA's plan to fabricate a false story and falsely
allege that J.A. was under the influence of a stimulant, and to
signal his plan to defendant HERNANDEZ, defendant VEGA asked J.A.
while J.A. was confined in the back of the SUV if J.A. was taking any
medications. Because the purported basis for the false detention and
arrest was fabricated, defendants VEGA and HERNANDEZ never took any
steps to determine whether J.A. actually exhibited any signs of being
under the influence of a controlled substance.

DEFT. INITIALS *M*                    4

1
2

**II.   Defendant VEGA Caused J.A. To Be Injured in a Traffic Collision
       in the SUV, After Which Defendants VEGA and HERNANDEZ Concealed
       Information About J.A. From Their Supervisor**

3        11.   While continuing to drive with J.A. confined in the back of

4   the SUV, defendants VEGA and HERNANDEZ saw a group of young males on

5   bicycles near the intersection of Alameda Street and 129th Street in

6   Compton.   Defendant VEGA saw what he believed to be a look of

7   surprise and fear on the face of one of the males upon encountering

8   the LASD deputies and therefore formed the belief that the male may

9   possess a firearm.

10       12.   Defendant VEGA began pursuing the bicyclist in the SUV, and

11  the male turned down an alleyway on his bicycle.   Defendant VEGA

12  stopped the SUV at the entry of the alley so that defendant HERNANDEZ

13  could get out of the vehicle.   Defendant VEGA then continued

14  following the bicyclist down the alley, with J.A. still confined in

15  the back of the SUV and not secured by a seatbelt.   Defendant VEGA

16  believed he saw the bicyclist toss a dark object over his head into a

17  yard running alongside the south wall of the alley.   Moments later,

18  as defendant VEGA continued pursuing the bicyclist down the alley, he

19  crashed the SUV into one of the walls of the alley and a parked car.

20       13.   During the collision, J.A. injured J.A.'s head, sustaining

21  a cut above J.A.'s eye.   Due to damage the SUV sustained in the

22  collision and based on the positioning of the SUV, defendant VEGA had

23  to climb out of the driver-side front window of the SUV.   J.A., who

24  was still confined in the back of the SUV, asked defendant VEGA

25  multiple times to let J.A. go.   J.A. promised defendant VEGA that

26  J.A. would not say anything about what happened that day if defendant

27  VEGA freed J.A.   Defendant VEGA told J.A. to "shut up for a second,"

28  or words to that effect.   Defendant VEGA then let J.A. out of the SUV

DEFT. INITIALS  _M_                    5

1  and told J.A. words to the effect of "get out of here."  After

2  getting out of the SUV, J.A. told defendant VEGA that J.A. had

3  sustained a cut to J.A.'s head during the collision.  Concerned that

4  J.A. was lingering for too long and that bystanders would see and

5  interact with J.A., defendant VEGA told J.A., "Dude, get the fuck out

6  of here," or words to that effect.  J.A. complied and walked west

7  through the alley, out of defendant VEGA's sight.  Defendant VEGA

8  wanted J.A. to flee the scene as quickly as possible and not tell

9  anyone about the events of that day because, among other reasons,

10  defendant VEGA knew that he and defendant HERNANDEZ did not have any

11  lawful basis to detain J.A.

12      14.  After the collision, defendant VEGA began reporting over

13  LASD radio that he was pursuing a suspect with a gun who was fleeing.

14  Defendant VEGA further reported over LASD radio that he had been

15  involved in a traffic collision and that the suspect had tossed an

16  article in the alley.  However, defendant VEGA did not disclose that

17  a person whom defendants VEGA and HERNANDEZ had detained (i.e., J.A.)

18  had been in the SUV at the time of the collision.

19      15.  Numerous deputies began responding to the area to search

20  for the suspect and the article the suspect discarded, according to

21  defendant VEGA's report.  Defendant VEGA contacted and asked

22  defendant HERNANDEZ, who got out of the SUV before the pursuit and

23  collision in the alley, to meet him in the alley near the wrecked

24  SUV.  When they met, defendant HERNANDEZ asked defendant VEGA where

25  J.A. was.  Defendant VEGA replied that he had "kicked" J.A., by which

26  defendant VEGA meant that he let J.A. go after the traffic collision.

27  Unbeknownst to defendant VEGA, another responding LASD deputy

28  encountered J.A. on a neighboring street while searching for the gun

DEFT. INITIALS _w/_                    6

1    suspect whom defendant VEGA had reported and independently re-

2    detained J.A. believing, incorrectly, that J.A. was the gun suspect

3    whom defendant VEGA had been pursuing in the alley.

4        16.   At some point, defendant VEGA was informed that a potential

5    gun suspect had been detained by other deputies on a neighboring

6    street.   Defendant VEGA responded to the other deputies' patrol

7    vehicle to view the apprehended person.   Defendant VEGA looked in the

8    backseat of the other deputies' patrol vehicle and was surprised to

9    see J.A., whom defendant VEGA hoped had fled the area.   Defendant

10   VEGA told the other deputies that J.A. was not the gun suspect and

11   explained that J.A. was in the backseat of the SUV at the time of the

12   collision.   Defendant VEGA told the other deputies to let J.A. go,

13   but one or both of the other deputies said they could not let J.A. go

14   because J.A. was injured.   Defendant VEGA instructed the other

15   deputies to "just hold on to" J.A., or words to that effect, for the

16   time being.

17       17.   At another point, Sergeant-1, who was defendants VEGA and

18   HERNANDEZ's supervisor, and who had responded to the alley near the

19   site of the traffic collision, spoke with defendants VEGA and

20   HERNANDEZ in the alley.   Defendants VEGA and HERNANDEZ told Sergeant-

21   1 that they were okay, and that defendant HERNANDEZ had not been in

22   the SUV at the time of the collision.   However, neither defendant

23   VEGA nor defendant HERNANDEZ disclosed to Sergeant-1 that they had

24   detained J.A. in the back of the SUV following the encounter at the

25   skatepark or that J.A. had been in the SUV during the collision.

26   Defendant VEGA knew that it was wrong to conceal this information

27   from Sergeant-1 and that this information would be important to

28   Sergeant-1.   Defendant VEGA feared that disclosing the information

DEFT. INITIALS  ᴍᴠ                7

1  would get defendants VEGA and HERNANDEZ into trouble because they had
2  no lawful basis to detain J.A. and because they had violated LASD
3  policy by not handcuffing J.A. or securing J.A.'s seatbelt in the
4  SUV.

5  **III. Defendants VEGA and HERNANDEZ Falsely Alleged That They Had**
6  **Detained J.A. for Being Under the Influence of Methamphetamine**
   **and Falsified Two Incident Reports to Cover Up Their Unlawful**
7  **Conduct**

8       18.  Despite an extensive search, LASD deputies were unable to
9  find either the suspect defendant VEGA had reported pursuing or the
10 article the suspect reportedly had tossed while fleeing.

11      19.  At some point later that day, after defendant VEGA
12 initially concealed the information during his LASD radio report of
13 the traffic collision and his initial meeting with Sergeant-1,
14 defendant VEGA finally disclosed to Sergeant-1 that J.A. had been in
15 the back of the SUV at the time of the collision.  When Sergeant-1
16 asked why J.A. had been in the SUV at the time of the collision,
17 defendant VEGA told Sergeant-1, "11550," referring to the provision
18 under the California Health and Safety Code for being under the
19 influence of a controlled substance.  J.A., who was later treated at
20 the hospital with stitches for the cut above J.A.'s right eye that
21 J.A. sustained during the traffic collision, was issued a citation at
22 the hospital for being under the influence of methamphetamine, in
23 violation of California Health and Safety Code Section 11550.  The
24 citation was issued to J.A. by another LASD deputy at defendant
25 HERNANDEZ's direction, consistent with defendant VEGA's plan to
26 fabricate the allegation that J.A. was under the influence of a
27 stimulant and to cover up defendant VEGA and HERNANDEZ's unlawful
28 detention of J.A. at the skatepark.

DEFT. INITIALS _M_                8

20.   Defendants VEGA and HERNANDEZ eventually returned to Compton Station and went to the report writing room to prepare two separate incident reports regarding the day's events.  One report, identified as LASD Incident Report No. 920-04690-2822-399, described the alleged circumstances surrounding defendants VEGA and HERNANDEZ's detention of J.A. at the skatepark (the "detention report").  The other report, identified as LASD Incident Report No. 920-04687-2820-151, described the alleged circumstances surrounding defendant VEGA's pursuit of the young male on a bicycle and the resulting traffic collision (the "collision report").

21.   Defendants VEGA and HERNANDEZ sat at different computer terminals and took turns working on the detention report and the collision report.  Defendants VEGA and HERNANDEZ wrote the reports together and coordinated drafting the reports by adding, deleting, and changing information.  When the detention and collision reports were complete, defendants VEGA and HERNANDEZ reviewed the reports and submitted them to a supervisor for review.  After receiving comments from Sergeant-1, defendants VEGA and HERNANDEZ later revised and re-submitted the reports.

22.   Because defendants VEGA and HERNANDEZ violated LASD policy by (1) detaining J.A. without any lawful basis, and (2) defendant VEGA simply releasing J.A., a detained suspect, following the collision in the alley, only for J.A. to be independently re-detained by another deputy and placed in another LASD vehicle, defendants VEGA and HERNANDEZ intentionally included false, misleading, and ambiguous information in the detention and collision reports designed to falsely justify and legitimize, and ultimately cover up, their unlawful conduct.

DEFT. INITIALS  *m/*                        9

23.    Specifically, in the detention report, defendants VEGA and HERNANDEZ falsely claimed that they detained J.A. because J.A. exhibited symptoms of a person under the influence of a stimulant, including, purportedly, profuse sweating, rapid speech, muttering unknown words, erratic behavior, teeth grinding, heavy breathing, and dilated pupils.    In fact, as defendants VEGA and HERNANDEZ knew, J.A. did not exhibit such symptoms.    Defendants VEGA and HERNANDEZ further falsely claimed in the detention report that J.A. threatened to harm people in the skatepark; that J.A. also threatened to harm defendants VEGA and HERNANDEZ; and that the crowd of people in the skatepark continued to move toward the SUV as defendants VEGA and HERNANDEZ drove away from the skatepark, the latter of which purportedly explained why defendants VEGA and HERNANDEZ chose, for purported safety reasons, not to handcuff, secure, or administer field sobriety tests to J.A.    Defendants VEGA and HERNANDEZ knew that none of these "facts" occurred.

24.    The detention report authored by defendants VEGA and HERNANDEZ also referenced the subsequent traffic collision and falsely claimed that after the crash, defendant VEGA requested an assisting unit to respond, checked J.A. for injuries, and that J.A. was placed in the patrol vehicle of an assisting unit and detained until paramedics arrived, when, in fact, as defendants VEGA and HERNANDEZ knew, defendant VEGA had instead simply released J.A. from the SUV without checking J.A. for injuries or placing him in a patrol vehicle until paramedics arrived.    Likewise, in the collision report, defendants VEGA and HERNANDEZ again falsely claimed that while assisting units were setting up a containment area following the traffic collision, defendant VEGA transferred J.A. to another patrol

DEFT. INITIALS _m_                    10

vehicle, when, in fact, as defendants VEGA and HERNANDEZ knew, defendant VEGA never transferred J.A. to another patrol vehicle.

25. Defendant VEGA knew when he and defendant HERNANDEZ wrote and endorsed all of these statements that the statements were deliberately false, and he made them intending to conceal and cover up their unlawful conduct from April 13, 2020.

DEFT. INITIALS *m*                    11